No. 16-1315

_____

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

_____

PAUL L. OLLIS

Claimant-Appellant,

v.

ROBERT A. MCDONALD,

Respondent-Appellee.

_____

On Appeal from the Court of Appeals for Veterans Claims
in case no. 14-1680, Decided October 28, 2015

_____

## BRIEF FOR PETITIONER

PAUL M. SCHOENHARD
Ropes & Gray LLP
2099 Pennsylvania Ave. NW
Washington, DC 20006
Tel: (202) 508-4693
Fax: (202) 383-8390
*Paul.Schoenhard@ropesgray.com*

SAMUEL L. BRENNER
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7120
Fax: (617) 951-7050
*Samuel.Brenner@ropesgray.com*

March 14, 2016

*Counsel for Claimant-Appellee*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## PAUL L. OLLIS V. ROBERT A. MCDONALD
### 2016–1315

## CERTIFICATE OF INTEREST

Counsel for Claimant-Appellant Paul. L. Olls certifies the following:

1. The full name of every party or amicus represented by me is:

   Paul L. Ollis

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   Paul L. Ollis

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below.

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   Paul M. Schoenhard, Ropes & Gray LLP
   Samuel L. Brenner, Ropes & Gray LLP


DATED: March 14, 2016                    _/s/ Paul M. Schoenhard_
                                         Paul M. Schoenhard

# TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................1

II.  JURISDICTIONAL STATEMENT ...............................................2

III.  STATEMENT OF THE ISSUES ....................................................3

IV.  STATEMENT OF THE CASE AND FACTS ..................................3

    A.  MR. OLLIS'S HEART CONDITION AND CARDIAC
        TREATMENT ...................................................................3

    B.  MR. OLLIS'S CLAIM FOR BENEFITS ...........................6

V.  SUMMARY OF THE ARGUMENT ...............................................9

VI.  ARGUMENT...............................................................................13

    A.  STANDARD OF REVIEW .................................................13

    B.  THE VETERANS COURT ERRED BY CONFLATING THE
        SEPARATE "CAUSE" AND "PROXIMATE CAUSE"
        REQUIREMENTS IN 38 U.S.C. § 1151(A) ......................14

        1.  Section 1151 must be construed in the beneficiaries' favor.....16

        2.  The "cause" and "proximate cause" requirements of
            Section 1151 are distinct and have different meaning..............17

        3.  The Veterans Court improperly treated the "cause"
            requirement as if it were instead a "proximate cause"
            requirement ...........................................................21

        4.  Mr. Ollis's reading of Section 1151 is bolstered by policy
            considerations........................................................26

    C.  THE VETERANS COURT ERRED BY CONCLUDING THAT
        MR. OLLIS'S DUE PROCESS RIGHTS WERE NOT
        VIOLATED WHEN HE WAS DENIED NOTICE AND AN
        OPPORTUNITY TO BE HEARD BEFORE LOSING HIS
        ENTITLEMENT TO BENEFITS .......................................28

VII.  CONCLUSION...........................................................................35

ADDENDUM

Opinion (Oct. 28, 2015) ..........................................................................................A1

# TABLE OF AUTHORITIES

**CASES**                                                                          **PAGES**

*Alaskan Arctic Gas Pipeline Co. v. United States,*
    831 F.2d 1043 (Fed. Cir. 1987) .........................................................................18

*American Fed'n of Labor & Cong. of Indus. Orgs., Indus. Union Dep't v.
    Marshall,*
    570 F.2d 1030 (D.C. Cir. 1978) .......................................................................18

*Andrews v. Principi,*
    351 F.3d 1134 (Fed. Cir. 2003) .......................................................................35

*Aransas Project v. Shaw,*
    775 F.3d 641 (5th Cir. 2014) ...........................................................................24

*Ardestani v. INS,*
    502 U.S. 129 (1991)..........................................................................................18

*Barrett v. Nicholson,*
    466 F.3d 1038 (Fed. Cir. 2006) ..................................................................13, 35

*Bartlett v. Shinseki,*
    24 Vet. App. 328 (2011) ...................................................................................19

*Board of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972)....................................................................................31, 32

*Brown v. Gardner,*
    513 U.S. 115 (1994)............................................................................16, 17, 20

*Burden v. Shinseki,*
    727 F.3d 1161 (Fed. Cir. 2013) ..................................................................16, 21

*Cantu v. Principi,*
    18 Vet. App. 92 (2004) .....................................................................................19

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985)......................................................................................2, 12

*Coffy v. Republic Steel Corp.*,
447 U.S. 191 (1980)..................................................................................16, 21

*Cushman v. Shinseki*,
576 F.3d 1290 (Fed. Cir. 2009) ...................................................*passim*

*Fishgold v. Sullivan Drydock & Repair Corp.*,
328 U.S. 275 (1946).......................................................................................17

*Foundation on Econ. Trends v. Lyng*,
943 F.2d 79 (D.C. Cir. 1991).....................................................................24

*Gardner v. Brown*,
5 F.3d 1456 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994)...................................18

*Goldberg v. Kelly*,
397 U.S. 254 (1970).......................................................................................32

*Goldsmith v. United States Board of Tax Appeals*,
270 U.S. 117 (1926).......................................................................................32

*Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.*,
687 F.3d 1045 (8th Cir. 2012) .................................................................24

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
668 F.3d 393 (6th Cir. 2012) .....................................................................24

*Henderson v. Shinseki*,
562 U.S. 428 (2011).................................................................................16, 20

*Hodge v. West*,
155 F.3d 1356 (Fed. Cir. 1998) .............................................................13, 34

*Institute of Cetacean Research v. Sea Shepherd Conservation Soc'y*,
774 F.3d 935 (9th Cir. 2014) .....................................................................24

*King v. St. Vincent's Hosp.*,
502 U.S. 215 (1991)..............................................................................16, 17, 21

*Lerner v. Fleet Bank, N.A.*,
318 F.3d 113 (2d Cir. 2003) .....................................................................24

*Mathews v. Eldridge*,
　424 U.S. 319 (1976)....................................................................28, 30

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
　460 U.S. 766 (1983)...............................................................................22

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
　339 U.S. 306 (1950)...............................................................................30

*National Ass'n of Radiation Survivors v. Derwinski*,
　994 F.2d 583 (9th Cir. 1992) ................................................................30

*Ollis v. McDonald*,
　27 Vet. App. 405 (2015) .................................................................2, 23

*Paroline v. United States*,
　134 S. Ct. 1710 (2014)...............................................21, 23, 24, 26

*United States v. Copeland*,
　376 F.3d 61 (2d Cir. 2004) .............................................................32, 33

*United States v. Kearney*,
　672 F.3d 81 (1st Cir. 2012).................................................................24

*United States v. Lopez-Velasquez*,
　629 F.3d 894 (9th Cir. 2010) ...............................................32, 33, 34

*United States v. Ubaldo-Figueroa*,
　364 F.3d 1042 (9th Cir. 2004) ..........................................................32

*Viegas v. Shinseki*,
　705 F.3d 1374 (Fed. Cir. 2013) .................................................*passim*

*Wolf v. Fauquier Cty. Bd. of Supervisors*,
　555 F.3d 311 (4th Cir. 2009) .............................................................24

## STATUTES

U.S. Const. amend. V................................................................12, 28, 29

U.S. Const. amend. XIV ...........................................................................28

38 U.S.C. § 1151 ..............................................................................*passim*

38 U.S.C. § 1151 .................................................................................*passim*

38 U.S.C. § 6303 ..............................................................................9, 34

38 U.S.C. § 7292 .........................................................................3, 13, 14

## OTHER AUTHORITIES

142 Cong. Rec. S9926-03 (Sept. 5, 1996) ............................................20

Michael P. Allen, *Due Process and the American Veteran: What the Constitution Can Tell Us About the Veterans' Benefits System*, 80 U. Cin. L. Rev. 501 (2011) ...............................................................................29

*Black's Law Dictionary* 234 (8th ed. 2004)...........................................20

*Dorland's Illustrated Medical Dictionary* 1957 (32d ed. 2012) .............19

W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* (5th ed. 1984) ....................................................................................................23

W. Prosser, Law of Torts ch. 7 (4th ed. 1971).......................................23

Remarks by Secretary Robert McDonald, U.S. Department of Veterans Affairs, during AMVETS National Conference (Aug. 13, 2014), http://www.va.gov/opa/pressrel/pressrelease.cfm?id=2608 ..............................27

Paul Richter & Richard Simon, *VA Says More Veterans May Use Private Medical Services*, LA Times, May 24, 2014 .....................................27

## STATEMENT OF RELATED CASES

Counsel for Petitioner are unaware of any related cases within the meaning of Federal Circuit Rule 47.5.  Counsel for Petitioner are also unaware of any other case pending in this Court or any other court that may directly affect or be affected by this Court's decision in this appeal.

## I.  INTRODUCTION

Paul Ollis, a veteran of the United States armed forces, is disabled as a result of a medical procedure that was performed outside the VA at the recommendation of his longtime VA cardiologist.  *See, e.g.*, A2−A3; A65−A66, A80.  Mr. Ollis applied for disability benefits under 38 U.S.C. § 1151, but his application was denied, and first the Board of Veterans' Appeals ("Board") and then the United States Court of Appeals for Veterans Claims ("Veterans Court") affirmed the denial of benefits because (in their view) his disability was not "caused" by "hospital care, medical or surgical treatment, or examination" furnished by a VA employee or in a VA facility.  A3−A4 (quoting 38 U.S.C. § 1151(a)(1)).  While Mr. Ollis would unquestionably have been covered as a beneficiary under § 1151 had the procedure itself been performed by a VA doctor or in a VA facility and resulted in negligent or unforeseen injury, the Veterans Court also concluded that the VA did not deprive Mr. Ollis of due process when the VA doctor referred him outside the VA without ever once telling him that, by following the doctor's referral, he would lose benefits to which he was entitled under § 1151.

In reaching its decision, the Veterans Court erred both by misinterpreting § 1151 and (even if its interpretation of the statute were correct) by incorrectly applying the requirements of the Due Process clause of the U.S. Constitution. With respect to § 1151, the Veterans Court misread both the statutory language

1

itself and this Court's precedent by conflating two separate causation requirements in the statute. Under the statute, a veteran is entitled to "as-if" service-connected disability benefits if the disability was *caused* by (among other things) "medical treatment" and the disability was *proximately caused* by (among other things) negligence or events not reasonably foreseeable. *See* 38 U.S.C. § 1151(a). Because the Veterans Court conflated these two requirements, however, when judging whether Mr. Ollis's disability was *caused* by the VA's medical treatment, the Veterans Court improperly analyzed whether Mr. Ollis's disability was *proximately caused* by medical treatment. With respect to constitutional Due Process protections, the Veterans Court erred by determining that the VA did not deny Mr. Ollis due process, because—when it sent him to a non-VA doctor, in a non-VA facility, to perform a procedure the VA could not perform itself—the VA *never told him that he would lose his benefits.* By failing to do so, the VA stripped Mr. Ollis of both the notice and opportunity to respond that are the "essential requirements of due process." *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–46 (1985).

Accordingly, the Veterans Court's decision should be reversed.

## II.     JURISDICTIONAL STATEMENT

This is an appeal from an October 28, 2015 decision of the United States Court of Appeals for Veterans Claims. *Ollis v. McDonald*, 27 Vet. App. 405

(2015); A1–A14.   This Court has jurisdiction to determine the appeal of the Veterans Court's decision pursuant to 38 U.S.C. § 7292.

## III.   STATEMENT OF THE ISSUES

(1)   Whether the Veterans Court erred by conflating the separate "cause" and "proximate cause" requirements in 38 U.S.C. § 1151(a), and so improperly considered whether Mr. Ollis's disability was ***proximately caused*** by medical treatment rather than whether Mr. Ollis's disability was ***caused*** by medical treatment.

(2)   Whether, *even if* the Veterans Court were correct that Mr. Ollis is not entitled to coverage under 38 U.S.C. § 1151, the Veterans Court erred in concluding that Mr. Ollis's Due Process rights were not violated when Mr. Ollis was never informed by the VA that, by following the VA's medical treatment (referral to a doctor outside the VA for a procedure the VA could not perform), he would be losing coverage under § 1151.

## IV.   STATEMENT OF THE CASE AND FACTS

### A.   Mr. Ollis's Heart Condition and Cardiac Treatment

Mr. Ollis served on active duty from June 1975 to March 1976.  A2.  In 1998, a physician at the Knoxville, Tennessee VA outpatient facility referred Mr. Ollis to Nashville VA Cardiology to address a diagnosis of atrial fibrillation.  A2; A65; A142.  Mr. Ollis agreed to the referral and "ha[s] been under the care of these cardiologists ever since."  A65.  More specifically, at that time, Mr. Ollis entered

3

the care of Dr. Jeffrey Rottman, a VA cardiologist at the Nashville VA medical center. *Id.* In March 1999, while under Dr. Rottman's care, Mr. Ollis underwent a failed ablation procedure at the Nashville VA. A2; A65; A144. A pacemaker was installed after the failure of that procedure. A2; A65. Thereafter, Mr. Ollis remained under the care of Dr. Rottman and the Nashville VA medical center. For example, when his pacemaker failed in 2005, the generator was replaced by Dr. Rottman. A65. Mr. Ollis was then seen by the Nashville VA again for follow-ups in 2006. A82. And when Mr. Ollis continued to have difficulties in the summer of 2007, he once again returned to the Nashville VA and Dr. Rottman. A65.

In June 2007, while he was at the Nashville VA for ongoing cardiac treatment, Mr. Ollis discussed available treatment options with the care team at the Nashville VA. A80; A2. At that time, Dr. Rottman referred Mr. Ollis outside the VA for a procedure called "miniMAZE." As Mr. Ollis later explained:

> [T]he VA and Dr. Jeffery Rottman referred me to an outside group . . . for a procedure called Mini Maze. ***Stating to me that I would be an ideal candidate for this procedure*** to correct the atrial fib that the Nashville VA has been treating me for since 1998. The VA in Nashville did not have the equipment to perform said procedure; therefore ***the referral to the other group was mandated*** in 2007.

A65 (emphasis added); *see also* A66 ("You will find in the progress notes where Dr. Rottman referred me to another group outside for the VCA for the Mini Maze procedure in 2007. In his statement to me, 'The VA does not have the equipment to perform the Mini Maze procedure, so ***we will have to send you somewhere else***

4

*to have the procedure done*.'" (emphasis added)); A143 ("[T]hey did not have the equipment at the veterans hospital here in Nashville and *I was referred to an outside entity* . . . ." (emphasis added))  Indeed, the VA's contemporaneous notes discuss the referral.  *See* A80 ("Surgical MAZE is one available option.  *The epicardial MAZE would be the current preference.*  While this is not available at the VA (specialized operators and equipment are required), it could be performed at other local institutions.  *Recommendations provided.*" (emphasis added)).

During a later Board of Veterans' Appeals videoconference, Mr. Ollis clarified that the VA had explicitly recommended that he have the procedure:

> *Q.  Um, did the V.A. recommend that you have the procedure or did-or did they simply advise you that a procedure was available?*
>
> *A.  They recommended that I have the procedure because of my age.*  Ah, they thought I could handle it a lot better than somebody at the age of seventy.
>
> Q.  Did the V.A. advise of the risks of the procedure?
>
> A.  No they did not.

A144 (emphasis added); *see also* A145 ("[T]he one thing that was not mentioned was—was phrenic nerve damage, that they did not mention that during—during the process.").

During the procedure, which was performed outside the VA by a Dr. Hall at Methodist Medical Center, Mr. Ollis's phrenic nerve was damaged, resulting in his current disability.  *See, e.g.*, A3 ("For purposes of this opinion, it is assumed that

Mr. Ollis's right phrenic nerve was damaged during the procedure and that his cardiac issues resumed following the surgery."); A65−A66, A68, A73−A74; A143.

After the recommended MiniMAZE procedure was performed, Mr. Ollis returned to Dr. Rottman and the Nashville VA for follow-up.  A73−A74 ("50yr old M with AFib, paroxysmal, on ASA, s/p dual chamber Guidant PPM, here for follow up.  Just underwent mino-MAZE [*sic*] with PVI surgically at Methodist in Oak Ridge, TN, unfortunately suffered a R phrenic nerve palsy post (40% r lung function now acc to patient)."); *see also* A66, A68, A72.

## B.    Mr. Ollis's Claim for Benefits

On July 10, 2008, Mr. Ollis filed a claim for benefits relating to the disability resulting from the August 2007 miniMAZE procedure.  *See* A301.  Mr. Ollis explained that the VAMC Nashville Heart Department had referred him to the Oak Ridge Methodist Medical Center.  *Id.*  During the procedure, he added, the doctors had "nicked/cut or cauterized the Phrenic Nerve, which paralysised [sic] my diaphragm and causes less lung air volume."  *Id.*[1]

---

[1]    Throughout his administrative appeal, Mr. Ollis has consistently explained that his disability is the result of the referral he received at the Nashville VA for the outside miniMAZE procedure.  For example, in a 2009 Notice of Disagreement Mr. Ollis explained that his condition was "the result of treatment received from VA refer[r]ed care."  A203.  In a separate 2009 letter to the Nashville regional office, Mr. Ollis stated that the VA should be held "responsible for my condition based on [the] referral" from the VA.  A201.  In his 2011 Substantive Appeal, Mr. Ollis explained that the "VA should be held liable for the treatment that caused the

The VA denied Mr. Ollis's claim on February 24, 2009, A205−A211, and Mr. Ollis appealed to the Board of Veterans Appeals. On April 1, 2014, the Board issued a decision affirming the denial of Mr. Ollis's claim for benefits under § 1151. A24–A43. Specifically, the Board concluded that Mr. Ollis's disability did not fall within the statute because the miniMAZE procedure had been performed by a non-VA doctor at a non-VA facility. A40−A42.

Acting *pro se*, Mr. Ollis appealed the Board's decision to the Court of Appeals for Veterans Claims. *See* A4. His initial brief stated that Dr. Rottman had provided recommendations for performance of the miniMAZE procedure, and that Mr. Ollis "was never instructed at any time by VA about the consequences of having this [procedure] performed without a referral from them." *Id.*

On May 1, 2015, the Veterans Court *sua sponte* ordered that the case be stayed for the Veterans Consortium Pro Bono Program to investigate the possibility of providing representation for Mr. Ollis, and that the parties submit supplemental memoranda of law on six questions, including questions about the scope of 38 U.S.C. § 1151 and whether veterans in Mr. Ollis's position are being denied due process. A15−A16. With Mr. Ollis having obtained pro bono counsel,

---

injury." A152. And in his testimony before the Board, Mr. Ollis reiterated that the miniMAZE procedure was done upon the recommendation of the VA. A484.

the parties filed the requested supplemental briefs and, on August 18, 2015, argued the case before the Veterans Court.  *See* A1.

On October 28, 2015, the Veterans Court issued it decision, with the two-judge majority affirming the denial of benefits to Mr. Ollis under § 1151 and concluding that Mr. Ollis's due process rights had not been violated.  A1–A14. One judge dissented, concluding that the majority's application of § 1151 was "unduly narrow and withdraws necessary protections from a rapidly growing class of veterans."  A12.

With respect to Mr. Ollis's § 1151 claim, the Veterans Court majority concluded that the facts of Mr. Ollis's disability do not meet the first causal requirement under the statute, that the disability must have been "***caused***" by "hospital care, medical or surgical treatment, or examination furnished the veteran" by a VA employee or in a VA facility.  *See* A5−A9.  More specifically, the Veterans Court concluded that the Federal Circuit in *Viegas* dictated that this "cause" element must be interpreted as being "consistent with the general interpretation of 'proximate cause' in the federal courts."  A8 n.8.  Applying this proximate cause standard, and assuming that Mr. Ollis's referral for the outside miniMAZE procedure constituted "medical treatment" under the statute, the Veterans Court then concluded that Mr. Ollis's disability was "too attenuated" to meet the statutory requirement.  A7−A8.  Having determined that Mr. Ollis's

disability did not meet the first causal requirement, the Veterans Court concluded that it need not address whether Mr. Ollis's disability met the second causal requirement, that the disability be "proximately caused" by (among other things) negligence or events not reasonably foreseeable.  A11−A12.

With respect to Mr. Ollis's procedural due process claim, the Veterans Court concluded that the VA had neither a statutory nor a constitutional duty to inform Mr. Ollis that undergoing the outside miniMAZE procedure might affect his eligibility for § 1151 benefits.  A9.  The Veterans Court noted that the language in the relevant statute (38 U.S.C. § 6303(c)) is merely hortatory, rather than an enforceable legal obligation.  A9−A10.  The Veterans Court then concluded that, at the time Mr. Ollis was referred outside the VA for the miniMAZE procedure the VA could not itself perform, Mr. Ollis did not have a vested property interest in § 1151 benefits, as "he had not yet shown his eligibility for section 1151 benefits," and "had not undergone the MAZE procedure, suffered an additional disability, or filed an application for section 1151 benefits."  A10−A11 (citing *Cushman v. Shinseki*, 576 F.3d 1290, 1297 (Fed. Cir. 2009)).

Mr. Ollis timely appealed the Veterans Court's decision to this Court.

## V.    SUMMARY OF THE ARGUMENT

In affirming the Board's decision that Mr. Ollis is not entitled to coverage under 38 U.S.C. § 1151, the Veterans Court erred both in interpreting § 1151 and

9

then in determining that (under that erroneous interpretation) Mr. Ollis's constitutional Due Process rights were nonetheless not violated when the VA failed to provide notice to Mr. Ollis that the medical treatment it was providing would (in the Veterans Court's view) irrevocably deprive Mr. Ollis of the coverage under § 1151 that would otherwise have been his right as a veteran.

With respect to the statutory question, the Veterans Court erred in interpreting § 1151 by conflating two separate and distinct causal requirements: first, that "hospital care, medical or surgical treatment, or examination" must be the "*cause*" of a disability; and second, that (among other things) negligence or events not reasonably foreseeable must be the "*proximate cause*" of that disability. *See* 38 U.S.C. § 1151(a) (emphasis added); *see also Viegas v. Shinseki*, 705 F.3d 1374, 1377–78 (Fed. Cir. 2013) ("Section 1151 thus contains two causation elements—a veteran's disability must not only be 'caused by' the hospital care or medical treatment he received from the VA, but also must be 'proximate[ly] cause[d]' by the VA's 'fault' or an unforeseen 'event.'").

In this case, Mr. Ollis's disability was *caused* by medical treatment—referral outside the VA for the procedure to be performed—and was *proximately caused* by either negligence or an event not reasonably foreseeable—the damaging of the phrenic nerve during the miniMAZE procedure. But the Veterans Court never even reached the second question, because it instead concluded that Mr.

Ollis's disability was not caused by medical treatment, as the disability was "too attenuated." *See* A7 ("Such an attenuation is present here.").

In doing so, however, the Veterans Court erred by conflating the "cause" and the "proximate cause" requirements, and thus improperly limiting the scope of § 1151 by using the more restrictive proximate cause test when analyzing the general cause requirement. Moreover, the Veterans Court not only used the test for proximate cause in place of the general cause requirement, but suggested in a footnote that this Court's decision in *Viegas requires* that it do so. *See* A8 n.8 ("[T]he Federal Circuit's *Viegas* decision addresses causation and constitutes a binding precedent that is consistent with the general interpretation of 'proximate cause' in the federal courts . . ."). But *Viegas* requires no such test. Indeed, the Veterans Court's interpretation directly contradicts this Court's observation in *Viegas* that, by adding the proximate cause requirement for unforeseen events to § 1151, Congress was *not* restricting the broader "cause" requirement. *Viegas*, 705 F.3d at 1382 ("In other words, although Congress added a second causation requirement [proximate cause] to section 1151 . . . *there is no indication that it intended to impose any additional restrictions on the statute's original causation element*." (emphasis added)).

Because of its error in reading the statute and this Court's precedent, the Veterans Court thus improperly analyzed whether Mr. Ollis's disability was

*proximately caused* by VA medical treatment rather than simply whether Mr. Ollis's disability was *caused* by VA medical treatment. The Veterans Court's erroneous decision should be reversed.

With respect to the Constitutional Due Process issue, the Veterans Court erred in concluding that, if Mr. Ollis is *not* entitled to benefits under § 1151, the VA did not deny him due process when it referred him out the door for a procedure without giving him notice that, by following the VA's recommendations, he would be giving up his benefits. As this Court has held, a veteran's "entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment to the United States Constitution." *Cushman*, 576 F.3d at 1298. And "[d]ue process of law has been interpreted to include notice and a fair opportunity to be heard." *Id*. at 1296; *Loudermill*, 470 U.S. at 542–46 (notice and opportunity to respond are the "essential requirements of due process"). Here, the VA never once suggested to Mr. Ollis that, by following the its treatment plan of getting the miniMAZE procedure, Mr. Ollis was losing his property interest in his entitlement to benefits. And, because he did not have notice of this deprivation of a property right, Mr. Ollis did not have the opportunity to *contest* that deprivation *ex ante*.

Both because the Veterans Court misinterpreted the "cause" requirement of § 1151(a), and separately because the Veterans Court incorrectly concluded that Mr. Ollis was not denied due process even if he was (in the view of the Veterans

Court) stripped of his rights to veterans' benefits without notice, this Court should reverse the Veterans Court's determination.

## VI.  ARGUMENT

### A.    Standard of Review

The veterans benefits system is designed to operate in a pro-claimant, non-adversarial manner.  *See, e.g.*, *Hodge v. West*, 155 F.3d 1356, 1362–64 (Fed. Cir. 1998).  "[I]n the context of veterans' benefits where the system of awarding compensation is so uniquely pro-claimant, the importance of systemic fairness and the appearance of fairness carries great weight."  *Id*. at 1363.  "The government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them."  *Barrett v. Nicholson*, 466 F.3d 1038, 1044 (Fed. Cir. 2006).

The Federal Circuit reviews legal determinations of the Court of Appeals for Veterans Claims de novo.  *See, e.g.*, *Cushman*, 576 F.3d at 1296 (citing *Prenzler v. Derwinski,* 928 F.2d 392, 393 (Fed. Cir. 1991)).  With respect to determinations of the Veterans Court, the Federal Circuit shall decide "all relevant questions of law, including interpreting constitutional and statutory provisions."  38 U.S.C. § 7292(d)(1).  The Federal Circuit may modify, reverse, or remand the case as appropriate if the Veterans Court's determination is not in accordance with law.  *Cushman*, 576 F.3d at 1296 (citing 38 U.S.C. § 7292(e)(1)).  Except to the extent

13

an appeal presents a constitutional issue, the Court may not review a challenge to a factual determination, or a challenge to a law or regulation as applied to the facts of a particular case.  38 U.S.C. § 7292(d)(2).

### B.   THE VETERANS COURT ERRED BY CONFLATING THE SEPARATE "CAUSE" AND "PROXIMATE CAUSE" REQUIREMENTS IN 38 U.S.C. § 1151(a)

38 U.S.C. § 1151 provides in relevant part:

For purposes of this section, a disability or death is a qualifying additional disability or qualifying death if the disability or death was not the result of the veteran's willful misconduct and—

(1) the disability or death ***was caused*** by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title, ***and the proximate cause*** of the disability or death was—

(A) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination; or

(B) an event not reasonably foreseeable; . . . .

38 U.S.C. § 1151(a) (emphasis added).

Here, it is undisputed that Mr. Ollis was referred outside the VA by his longtime VA treating cardiologist for performance of a miniMAZE procedure. *See, e.g.*, A2; A65−A66.  And it is undisputed that Mr. Ollis's phrenic nerve disability is the result of that procedure having been performed.  *See, e.g.*, A3; A65−A66; A68; A73−A74; A143.  Nevertheless, the Veterans Court decided that

14

§ 1151(a) does not apply to Mr. Ollis's disability, based upon an erroneous interpretation of the first "cause" element of that statute.[2]

More specifically, in concluding that Mr. Ollis was not entitled to benefits under 38 U.S.C. § 1151, the Veterans Court misread both the statute and this Court's precedent, and so incorrectly conflated the separate "cause" and "proximate cause" requirements in the statute. As a result, the Veterans Court improperly analyzed whether Mr. Ollis's disability was *proximately caused* by VA medical treatment, rather than (as it was required to do) whether Mr. Ollis's disability was *caused* by VA medical treatment. But the statute—which must be construed in the beneficiaries' favor—and this Court's precedent demonstrate that, in fact, the "cause" and "proximate cause" requirements in § 1151 are distinct, and must be analyzed with different tests. 38 U.S.C. § 1151; *Viegas*, 705 F.3d at 1382. Because it was relying upon an incorrect reading of § 1151, and incorrectly applying the *proximate cause* test for the *cause* requirement, the Veterans Court incorrectly concluded that Mr. Ollis's disability was not caused by the VA's medical treatment—and never reached the question of whether Mr. Ollis's

---

[2]     The Veterans Court "[a]ssum[ed] arguendo that Dr. Rottman's advice and recommendations" constitute "medical treatment" by a VA employee within the meaning of the "cause" requirement of § 1151(a). A8. And the Veterans Court did not address the second cause element ("proximate cause") of § 1151(a). A11. The "cause" element is thus the focus of this appeal. At least the "proximate cause" element requires further factual development on remand.

disability was proximately caused by negligence or events not reasonably foreseeable. Because the Veterans Court was relying on an incorrect reading of the statute, the Veterans Court's determination should be reversed.

### 1. Section 1151 must be construed in the beneficiaries' favor.

Like all veterans' benefits statutes, 38 U.S.C. § 1151 must be construed in favor of beneficiaries such as Mr. Ollis. As the Supreme Court has reiterated, veterans' benefits statutes "are to be construed in the beneficiaries' favor." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220 n.9 (1991); *see also Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) ("We have long applied the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." (internal quotation marks omitted)); *Brown v. Gardner*, 513 U.S. 115, 117–18 (1994) ("[I]nterpretive doubt is to be resolved in the veteran's favor."); *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196 (1980) ("The statute is to be liberally construed for the benefit of the returning veteran."); *see also Burden v. Shinseki*, 727 F.3d 1161, 1169 (Fed. Cir. 2013) (citing *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946) and explaining that veterans "legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need.").

Indeed, the Supreme Court has explained that this principle takes primacy and is to be applied in the event of any doubt or conflicting interpretation, without

need of true ambiguity, and before further consideration of adverse alternatives. *Fishgold*, 328 U.S. at 285 ("Our problem is to construe the separate provisions of the Act as parts of an organic whole, and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits."); *King*, 502 U.S. at 220 n.9 ("[W]e would ultimately read the provision in King's favor under the canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor."); *Gardner*, 513 U.S. at 118 ("The most, then, that the Government could claim on the basis of this term is the existence of an ambiguity to be resolved in favor of a fault requirement (assuming that such a resolution would be possible *after* applying the rule that interpretive doubt is to be resolved in the veteran's favor)." (citation omitted)).

### 2.    The "cause" and "proximate cause" requirements of Section 1151 are distinct and have different meaning.

Critically, the separate "cause" and "proximate cause" requirements in § 1151—which relate to different criteria—are distinct and have different meaning. Accordingly, treating them as if they were the *same* requirement—*i.e.* both "proximate cause"—is erroneous.

As noted, § 1151(a) in relevant part provides the following:

For purposes of this section, a disability or death is a qualifying additional disability or qualifying death if the disability or death was not the result of the veteran's willful misconduct and—

(1) the disability or death **was caused by** hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title, **and the proximate cause** of the disability or death was—

(A) carelessness, negligence, lack of proper skill, error in judgment, or similar instance of fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination; or

(B) an event not reasonably foreseeable; . . . .

38 U.S.C. § 1151(a) (emphasis added).

On its face,[3] § 1151(a) reflects Congress's intent that *two separate* causal elements be met: (1) a "cause" requirement tied to "hospital care, medical or surgical treatment, or examination"; and (2) a "*proximate* cause" requirement tied to (among other things) negligence or events not reasonably foreseeable. *Id.*; *see also Viegas*, 705 F.3d at 1377–78 ("Section 1151 thus contains two causation elements—a veteran's disability must not only be 'caused by' the hospital care or

---

[3]    "It is well established, in cases involving statutory construction, that the statutory language itself is the best indication of congressional intent." *Alaskan Arctic Gas Pipeline Co. v. United States*, 831 F.2d 1043, 1046 (Fed. Cir. 1987); *see also Am. Fed'n of Labor & Cong. of Indus. Orgs., Indus. Union Dep't v. Marshall*, 570 F.2d 1030, 1036 (D.C. Cir. 1978) ("It is a well-known canon of construction that the language of a statute is the best indication of legislative intent." (citing *Browder v. United States*, 312 U.S. 335, 338 (1941)). "The Secretary must make an extraordinarily strong showing of clear legislative intent in order to convince us that Congress meant other than what it ultimately said." *Gardner v. Brown*, 5 F.3d 1456, 1460 (Fed. Cir. 1993), *aff'd*, 513 U.S. 115 (1994); *see also Ardestani v. INS*, 502 U.S. 129, 135 (1991) ("The strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances when a contrary legislative intent is clearly expressed." (internal quotation marks and citations omitted)).

18

medical treatment he received from the VA, but also must be 'proximate[ly] cause[d]' by the VA's 'fault' or an unforeseen 'event.'").

Each of these two requirements imposes a different limitation on the circumstances under which benefits may be awarded under § 1151 when a veteran is referred to a non-VA facility.  The two causation elements in § 1151 are thus different, and thus require different tests:

**First**, the "cause"—not the "*proximate* cause"—of the disability or death must have been "hospital care, medical or surgical treatment, or examination" furnished "by a Department employee or in a Department facility."  38 U.S.C. § 1151(a)(1).  In this context, the Veterans Court has defined "medical or surgical treatment" as "medical care given to a patient for an illness or injury."  *See Bartlett v. Shinseki*, 24 Vet. App. 328, 334 n.7 (2011).[4]  While § 1151 does not extend to the "*remote* consequences" of medical treatment provided by the VA, *Viegas*, 705 F.3d at 1383, "medical or surgical treatment" is a "cause" of "disability or death" when there is a "causal connection" between the treatment and the injury.

---

[4]    Consistent with this definition and the well-understood meaning of the word "treatment," "medical or surgical treatment" encompasses, for example, the provision of medical advice regarding the safety and efficacy of, and alternatives to, possible procedures, and the act of referral itself.  *See, e.g.*, *Cantu v. Principi*, 18 Vet. App. 92, 93 (2004) (VA physician's plan of treatment included referral to private physician for additional tests); *see also Dorland's Illustrated Medical Dictionary* 1957 (32d ed. 2012) (defining "treatment" as "the management and care of a patient for the purpose of combating disease or disorder").

*Gardner*, 513 U.S. at 119; *Viegas*, 705 F.3d at 1380; *see also Black's Law Dictionary* 234 (defining and distinguishing between various definitions for types of causes).

**Second**, the "proximate cause" of the disability or death must have been "fault on the part of the Department in furnishing the hospital care, medical or surgical treatment, or examination" or "an event not reasonably foreseeable." 38 U.S.C. § 1151(a)(1)(A), (B).  A "proximate cause," of course, is "[a] cause that is legally sufficient to result in liability."  *Black's Law Dictionary* 234 (8th ed. 2004).  Section 1151 provides no further limitation on "proximate cause" in this context.  *See Viegas*, 705 F.3d at 1383 ("If it had wanted to impose a requirement that the 'direct' cause of a veteran's injury must be the 'actual' medical treatment provided by VA personnel, Congress could readily have inserted such a requirement into the statutory text.").  And resort to legislative history uncovers only that the stated purpose of the amendment that introduced the "proximate cause" requirement was simply to "require[e] that there be an element of fault as a precondition for entitlement to compensation for a disability or death resulting from health care or certain other services furnished by the Department of Veterans Affairs"—the requirement of § 1151(a)(1)(A). 142 Cong. Rec. S9926-03, at S9932 (Sept. 5, 1996).  The "proximate cause" requirement must thus be interpreted broadly in favor of the veteran.  *See, e.g.*, *Henderson*, 562 U.S. at 441; *Gardner*,

513 U.S. at 117–18; *King*, 502 U.S. at 220 n.9; *Coffy*, 447 U.S. at 195; *Burden*, 727 F.3d at 1169.  The only apparent limit is that "the statute does not extend to the 'remote consequences' of the hospital care or medical treatment provided by the VA."  *Viegas*, 705 F.3d at 1383 (quoting *Gardner*, 513 U.S. at 119).

As the Supreme Court has recently reiterated, "proximate cause" and "cause" are separate legal concepts:

> ***Every event has many causes, however, and only some of them are proximate, as the law uses that term.*** So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. It is "a flexible concept," that generally "refers to the basic requirement that ... there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct.  ***A requirement of proximate cause thus serves,*** inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.*

*Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014) (emphasis added) (internal citations omitted).

### 3.  The Veterans Court improperly treated the "cause" requirement as if it were instead a "proximate cause" requirement.

As the separate "cause" and "proximate cause" requirements in § 1151 are distinct and have different meaning, treating them as if they were the *same—i.e.*

both "proximate cause"—is erroneous.  But that is exactly that the Veterans Court did in this case, concluding that Mr. Ollis was not entitled to benefits because his disability was not the ***proximate cause*** of the VA's medical treatment.

In a footnote in its decision, the Veterans Court makes explicit that it believes that the "cause" requirement of § 1151 must be interpreted as "proximate cause"—and that it is relying on this Court's precedent for that erroneous reading: "the Federal Circuit's *Viegas* decision addresses causation and *constitutes a binding precedent that is consistent with the general interpretation of 'proximate cause' in the federal courts*."  A8 n.8 (emphasis added).

That the Veterans Court erroneously applied the proximate cause standard to the general cause requirement is also demonstrated by the caselaw the Veterans Court cited, and the basis for the Veterans Court's decision that Mr. Ollis's disability was not "caused" by the VA's medical treatment.  *See* A7.  For example, the Veterans Court cites to *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983), in support of its conclusion that conduct is not a "cause" of injury when "the injury is simply too attenuated from the conduct." *Id*. The Veterans Court specifically quoted the statement that "[s]ome effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within [the statute's purview] *because the causal chain is too attenuated*." *Metro. Edison*, 460 U.S. at 774 (emphasis added),

*quoted in Ollis*, 27 Vet. App. at 410 (A7).  But as the Supreme Court explained in *Metro. Edison*, the causation requirement at issue in the statute at issue in *that* case was "like the familiar doctrine of *proximate* cause from tort law.  *See generally* W. Prosser, Law of Torts ch. 7 (4th ed. 1971).  The issue before us, then, is how to give content *to this requirement.*"  *Id.* (emphasis added).  As it had determined that the causation requirement in the statute was a *proximate* causation requirement, the Supreme Court then applied the *proximate cause* test in deciding the case.  *Id.*; *cf.* W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* (5th ed. 1984) (chapter 7 entitled "Proximate Cause").

Here, the Veterans Court's holding with respect to § 1151 was that Mr. Ollis's injury was "too attenuated from the conduct" to be "cause[d]" within the meaning of the statute.  *See* A7 ("Such an attenuation is present here.").  But, as *Metro. Edison* demonstrates, "attenuation" is a test for *proximate* cause—not *cause*.  *See also Paroline*, 134 S. Ct. at 1719 ("A requirement of proximate cause thus serves, *inter alia,* to preclude liability in situations where the causal link between conduct and result is ***so attenuated*** that the consequence is more aptly described as mere fortuity.") (emphasis added) (citation omitted).

It is thus clear that, in analyzing whether Mr. Ollis's disability was ***caused*** by the VA's medical treatment, the Veterans Court instead focused on whether Mr. Ollis's disability was ***proximately caused*** by the VA's medical treatment.  As

23

"proximate cause" is a much more exacting standard to meet than simply "cause," the Veterans Court was thus erroneously requiring that the facts of Mr. Ollis's case meet a standard higher than that laid out in the statute.[5]

The problem with the Veterans Court's treatment of the "cause" requirement as actually being a "proximate cause" requirement is that this reading flies in the face both of the statute itself and this Court's explicit conclusions in *Viegas*.

As an initial matter, § 1151 uses *different terms*—"cause" versus "proximate cause"—for the two sets of criteria. *See* 38 U.S.C. § 1151. As this Court observed

---

[5]    Like the Supreme Court in *Paroline* and *Metro. Edison*, numerous federal Courts of Appeals have similarly made clear that the "too attenuated" or "so attenuated" test is a test for ***proximate*** cause. *See, e.g.*, *United States v. Kearney*, 672 F.3d 81, 100 n.16 (1st Cir. 2012) (discussing "whether the causal chain was too attenuated to satisfy the standard of proximate cause"); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003), as amended (Apr. 16, 2003) ("[T]he connection between the RICO violation and the injury alleged is too attenuated to satisfy the proximate cause requirement"); *Wolf v. Fauquier Cty. Bd. of Supervisors*, 555 F.3d 311, 321 (4th Cir. 2009) (negligence was not the proximate cause of harm "for the causal link between the two is simply too attenuated"); *Aransas Project v. Shaw*, 775 F.3d 641, 662–63 (5th Cir. 2014) ("Proximate cause eliminates liability for actors when the resulting harm is too attenuated from their negligence . . . ."); *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405 (6th Cir. 2012) (concluding "alleged injuries are too attenuated from the alleged fraud" to constitute proximate cause); *Hamilton v. Bangs, McCullen, Butler, Foye & Simmons, L.L.P.*, 687 F.3d 1045, 1051 (8th Cir. 2012) ("[A]ny negligent action by Hurd is too attenuated to be a proximate cause of the loss of Hamilton's net worth."); *Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 90 (D.C. Cir. 1991) (events cannot be "proximate cause" when the "causal connection is 'too attenuated'" (quoting *Metro. Edison*, 460 U.S. at 774)); *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 951 (9th Cir. 2014) (citing *Paroline*, 134 S.Ct. at 1719, for the principle that attenuation is a test for proximate cause).

in *Viegas*, "Congress plainly knew how to deploy adjectives when it wished to modify the meaning of the word 'cause.'" 705 F.3d at 1383. That Congress chose not to do so demonstrates clearly that the general "cause" requirement of § 1151 is *not* a "proximate cause" requirement.

Moreover, contrary to the Veterans Court's conclusion, that is exactly what this Court concluded in *Viegas*. In that case, the Court discussed how Congress added the "proximate cause" requirement (relating to negligence and unforeseen events) in addition to the "cause" requirement (related to, among other things, medical treatment), and explained:

> Although the 1996 amendment to section 1151 clearly served to restrict the statute's reach to situations in which a veteran's injury resulted from "fault" on the part of the VA or an unforeseeable "event," there is nothing to suggest that it was intended to impose additional limitations on the statute's original requirement that a veteran's injury must be the result of medical care provided by the VA. In other words, ***although Congress added a second causation requirement to section 1151, requiring a showing of fault on the part of the VA, there is no indication that it intended to impose any additional restrictions on the statute's original causation element***. Significantly, the amended version of section 1151 specifies that the "cause" of a veteran's injury must be VA hospital care or medical or surgical treatment, but that the "*proximate* cause" of that injury must be the VA's negligence.

*Viegas*, 705 F.3d at 1382 (citations omitted) (emphasis added). Indeed, the *Viegas* court explicitly concluded that § 1151 does *not* include one of the hallmarks of proximate cause—that any injury be ***"directly"*** caused by the harm. *Compare id.* at 1378 ("Nothing in the plain language of section 1151 requires that a veteran's

injury must be 'directly' caused by the 'actual' provision of medical care by VA personnel.") *with Paroline*, 134 S. Ct. at 1719 (explaining that proximate cause refers to the "basic requirement" that there be "some direct relation between the injury asserted and the injurious conduct alleged") (citations omitted).

By reading the general "cause" requirement of § 1151 as "proximate cause," and by applying the same test to that general ***cause*** requirement that the courts should apply to the ***proximate cause*** requirement relating to negligence and unforeseen events, the Veterans Court misread § 1151 and contradicted this Court's decision in *Viegas*.

### 4.     Mr. Ollis's reading of Section 1151 is bolstered by policy considerations.

Mr. Ollis's reading of § 1151 is further bolstered by policy considerations relating to the protection of U.S. veterans.  The purpose of § 1151(a) is indicated clearly by the language of the statute: to provide coverage for additional events resulting in the death or disability of veterans.  *See* 38 U.S.C. § 1151(a).  If a veteran's disability or death results from the malpractice of a private treating physician at a non-VA facility, where such consequences are remote from any VA act or failure to act, then § 1151(a) may not apply.  But if the VA bears at least some fault for the veteran's disability or death, or if the veteran's disability or death is the result of an event that was not reasonably foreseeable, then § 1151(a) provides for an award of benefits.  If that coverage is lost when the VA refers

26

veterans to non-VA facilities, then the VA will have a perverse incentive to refer veterans to non-VA facilities, because doing so will allow the VA to avoid *directly* addressing possible "carelessness, negligence, lack of proper skill, [or] error in judgment" on the part of VA personnel.  *See* 38 U.S.C. § 1151(a)(1)(A).

In the two months preceding August 2014 alone, the VA referred over *830,000* veterans to private facilities.  *See* Remarks by Secretary Robert McDonald, U.S. Department of Veterans Affairs, during AMVETS National Conference (Aug. 13, 2014), http://www.va.gov/opa/pressrel/pressrelease. cfm?id=2608.  That increase was likely the direct result of the VA broadening access to non-VA facilities in the face of serious shortcomings in VA facilities and procedures.  *Cf.* Paul Richter & Richard Simon, *VA Says More Veterans May Use Private Medical Services*, LA Times, May 24, 2014.  There is no indication that Congress necessarily intended to allow this sort of offloading of veteran care to preclude those veterans from retaining the protections of § 1151.

Put another way, there are circumstances—as here—under which Congress's intent, as expressed in the plain language of § 1151, is to award § 1151 benefits when a veteran is referred to a non-VA facility based on a VA medical center's inability to provide a specific treatment, and the veteran subsequently is disabled at the non-VA facility during provision of that treatment.

## C. THE VETERANS COURT ERRED BY CONCLUDING THAT MR. OLLIS'S DUE PROCESS RIGHTS WERE NOT VIOLATED WHEN HE WAS DENIED NOTICE AND AN OPPORTUNITY TO BE HEARD BEFORE LOSING HIS ENTITLEMENT TO BENEFITS

If this Court decides that the Veterans Court is correct, and § 1151(a) does not provide a statutory right to benefits to Mr. Ollis because Mr. Ollis's miniMAZE procedure was performed by a non-VA doctor at a non-VA facility, then this Court should decide that the VA deprived Mr. Ollis of a property right protected by the Due Process Clause because the VA's referral for the miniMAZE procedure outside the VA diminished the benefits (or ability to apply for benefits) which he would otherwise have received under § 1151(a). Put more directly, Mr. Ollis had a non-discretionary, statutorily mandated *right to coverage* under § 1151 should he at any time meet the requirements of § 1151(a). And what was taken from him, without notice or opportunity to address this deprivation, was exactly that right to coverage.

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. As the Supreme Court has explained, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

"To raise a due process question, the claimant must demonstrate a property interest entitled to such protections." *Cushman*, 576 F.3d at 1296 (citing *Richard ex rel. Richard v. West,* 161 F.3d 719, 723 (Fed. Cir. 1998)).  As an initial matter, veterans such as Mr. Ollis have a property interest in the *entitlement* to disability benefits—and thus have an interest both in the protections that 38 U.S.C. § 1151(a) affords all veterans being treated by the VA, as well as in the benefits under § 1151(a) that have been denied to each veteran in particular.  Indeed, the Federal Circuit has explicitly held that a veteran's "entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment to the United States Constitution." *Cushman*, 576 F.3d at 1298; *see also* Michael P. Allen, *Due Process and the American Veteran: What the Constitution Can Tell Us About the Veterans' Benefits System*, 80 U. Cin. L. Rev. 501, 502 (2011) ("[A]pplicants for veterans' benefits have a constitutionally protected property interest in their *application* for benefits." (emphasis added)).  If Mr. Ollis's surgery had been performed in a VA facility and yielded the same result, he would be eligible for benefits under § 1151(a), and would accordingly have a property right in those benefits. *See, e.g.*, 38 U.S.C. § 1151(a); *Cushman*, 576 F.3d at 1298.

Here, the due process violation stems from the VA's failure to advise Mr. Ollis that he would lose his statutorily mandated right to coverage under § 1151(a) should he be treated in a non-VA facility.  As this Court has observed, "[d]ue

29

process of law has been interpreted to include notice and a fair opportunity to be heard." *Cushman*, 576 F.3d at 1296 (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).   But the VA's failure to advise Mr. Ollis meant that Mr. Ollis was deprived of benefits under § 1151(a) and his guaranteed *right* to benefits under § 1151 should he meet the requirements *without even initial notice*—which the Supreme Court has explained is "[a]n elementary and fundamental requirement of due process." *See Mullane*, 339 U.S. at 314.   And, without notice, Mr. Ollis was necessarily unable to contest any potential differences in liability or compensation under § 1151(a) before (in the Veterans Court's view) he lost his benefits under the statute.   *See Mathews*, 424 U.S. at 333 ("This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest" (citation omitted); "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (citation omitted)).

In *Cushman*, this Court observed that numerous courts have concluded that "applicants for benefits, no less than benefits recipients, may possess a property interest in the receipt of public welfare entitlements." *See Cushman*, 576 F.3d at 1297 (collecting cases from seven additional circuits); *see also Nat'l Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 588 n.7 (9th Cir. 1992) ("[B]oth applicants for and recipients of [service-connected death and disability] benefits

30

possess a constitutionally protected property interest in those benefits.").   In its decision, the Veterans Court concluded that Mr. Ollis was not deprived of *his* due process rights because, at the time he referred for the miniMAZE procedure, he had not yet applied for benefits.  *See* A11 ("Succinctly stated, Mr. Ollis's property interest would not vest until and unless he met the eligibility requirements for section 1151 benefits.").[6]

But the Veterans Court misapprehends Mr. Ollis's property interest: as a veteran, Mr. Ollis has a property interest not only in benefits under § 1151 and in his *application* for benefits under § 1151, but he also has a property interest in his non-discretionary, statutorily mandated *right to coverage* under § 1151 should he meet the requirements of § 1151(a).   *See, e.g.*, *Cushman*, 576 F.3d at 1298 ("Veteran's disability benefits are nondiscretionary, statutorily mandated benefits."); *see also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("[T]he welfare recipients in *Goldberg v. Kelly*, supra, had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within

---

[6]    Notably, the Veterans Court's reasoning would create a Catch 22 for the literally millions of veterans referred for treatment outside the VA by an overwhelmed VA system: those veterans could apply for benefits under § 1151 only *after* being injured by that outside-the-VA treatment, but, by *accepting* that outside-the-VA treatment in the first place would (in the Veterans Court's view) no longer be able to apply.

the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so") (discusssing *Goldberg v. Kelly*, 397 U.S. 254 (1970)); *id.* at 577 n.15 (discussing *Goldsmith v. United States Board of Tax Appeals*, 270 U.S. 117 (1926), and noting that the Supreme Court stated that the *existence* of eligibility rules "gave the petitioner an interest and claim to practice before the Board to which procedural due process requirements applied"). And that property interest vested before the VA referred Mr. Ollis for the miniMAZE procedure. Because Mr. Ollis had these rights, the VA's failure to advise him that he would be *losing* these rights by following the VA's medical treatment thus constituted a Due Process violation.

Notably, in other contexts, courts have explicitly held that failure to advise parties of their statutorily guaranteed rights similarly constitutes such a Due Process violation. For example, in the immigration context, both the Ninth Circuit and the Second Circuit have held that an immigration judge's failure to advise aliens of *possible* forms of relief—even *discretionary* relief—violates due process. *See, e.g.*, *United States v. Lopez-Velasquez*, 629 F.3d 894, 897 (9th Cir. 2010); *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1050 (9th Cir. 2004) ("[F]ailure to so inform the alien [of his or her eligibility for relief from removal] is a denial of due process that invalidates the underlying deportation proceeding" (alterations in original)); *United States v. Copeland,* 376 F.3d 61, 70–73 (2d Cir. 2004).

32

In its decision, the Veterans Court concluded that *Lopes-Velasquez* and *Copeland* were inapposite. *See* A10. But the Veterans Court misses the similarity between the deprivation of the property rights of aliens on the one hand and veterans under § 1151 on the other. For example, the Veterans Court concluded that *Copeland* was inapposite because, in its view, "the *Copeland* court based its analysis on an immigration statute . . . not on due process." *Id.* But the Veterans Court is misreading *Copeland*. While *Copeland* indeed was addressing a question in the context of an immigration statute, the question in *Copeland* was whether the constitutional due process rights of an alien facing removal were violated where an IJ *did not inform the alien of potential eligibility for benefits under that statute*. *See Copeland*, 376 F.3d at 70–73. And the Second Circuit in *Copeland* concluded that they were. *Id.* In *Copeland*, as in Mr. Ollis's situation, the due process violation occurred when the agency failed to inform a potential beneficiary of potential eligibility for benefits under a governing statute.

The Veterans Court's analysis of *Lopez-Velasquez* similarly misses the mark. The Veterans Court concluded that, "although *Lopez-Velasquez* used the term 'due process,' the 'failure to inform' in that case was a failure that occurred during administrative deportation proceedings – not, as here, before administrative proceedings commenced." A10. As an initial matter, it was not simply that the *Lopez-Velasquez* court "used the term 'due process.'" In fact, *Lopez-Velasquez*

(and the Ninth Circuit cases on which it rests) directly *addressed* constitutional due process protections. *See, e.g.*, *Lopez-Velasquez*, 629 F.3d at 897. Moreover, the distinction between whether formal administrative proceedings have begun or not is irrelevant. In either case, agency personnel are governed by the statutes that in turn govern their respective agencies. While immigration judges have a duty to the aliens appearing before them, VA personnel—especially VA *medical* personnel—similarly have a duty to the patients to whom they dispense medical treatment.

Policy considerations are clearly in accord with the conclusion that a veteran is denied an important property right without due process of law when he or she is not advised of any differences in compensation or liability under 38 U.S.C. § 1151(a) that would result from receiving treatment at a non-VA facility pursuant to a VA referral, rather than at a VA facility itself. As noted previously, and as the Supreme Court and Federal Circuit have regularly observed, veterans' benefits statutes are to be liberally construed in favor of the veterans. *See, e.g.*, *Hodge*, 155 F.3d at 1362 ("[T]he character of the veterans' benefits statutes is strongly and uniquely pro-claimant.") (collecting cases). Indeed, Mr. Ollis's case demonstrates the importance of the VA's affirmative constitutional obligation to adequately advise veterans in Mr. Ollis's position.[7] By referring veterans to private facilities,

---

[7] The VA already has an affirmative *statutory* duty to ensure that veterans are fully aware of their benefits. *See, e.g.*, 38 U.S.C. § 6303(c)(1)(a) ("The Secretary **shall** distribute **full information** to eligible veterans and eligible dependents

the VA—as happened here—may be contributing to those veterans receiving different compensation than they would otherwise have received under § 1151(a), and is thus also participating in depriving those veterans of property rights protected by the Due Process clause of the U.S. Constitution.

By not providing adequate notice to veterans receiving medical treatment including referrals for outside procedures that they would lose their benefits by following the VA's medical treatment, the VA is thus assisting in depriving veterans of their rights without due process. But that violates the government's fundamental interest in veterans cases. *See, e.g.*, *Barrett*, 466 F.3d at 1044 ("The government's interest in veterans cases is not that it shall win, but rather that justice shall be done, that all veterans so entitled receive the benefits due to them."). And that is exactly what happened to Mr. Ollis.

## VII.  CONCLUSION

For the foregoing reasons, Claimant-Appellant Paul Ollis respectfully requests that this Court reverse the determination of the Court of Appeals for Veterans Claims and find either that Mr. Ollis is entitled to benefits under 38 U.S.C. § 1151, or else remand this matter for appropriate consideration.

---

regarding all benefits and services to which they may be entitled under laws administered by the Secretary" (emphasis added)). While this language has been found to be hortatory, rather than an enforceable legal obligation, *see Andrews v. Principi*, 351 F.3d 1134, 1137 (Fed. Cir. 2003), the language of the statute highlights the due process importance of notice and opportunity to be heard.

Respectfully submitted,

March 14, 2016

/s/ *Paul M. Schoenhard*
PAUL M. SCHOENHARD
Ropes & Gray LLP
2099 Pennsylvania Ave. NW
Washington, DC  20006
Tel: (202) 508-4693
Fax: (202) 383-8390
*Paul.Schoenhard@ropesgray.com*

SAMUEL L. BRENNER
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7120
Fax: (617) 951-7050
*Samuel.Brenner@ropesgray.com*

*Counsel for Claimant-Appellant Paul L. Ollis*

**ADDENDUM**

# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 14-1680

PAUL L. OLLIS, APPELLANT,

V.

ROBERT A. MCDONALD,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued August 18, 2015                         Decided October 28, 2015)

*Paul M. Schoenhard*, of Washington, D.C., with whom *Samuel L. Brenner*, of Boston, Massachusetts, was on the brief, for the appellant.

*Mark D. Vichich*, with whom *Leigh A. Bradley,* General Counsel; *Mary Ann Flynn*, Assistant General Counsel; and *Drew A. Silow*, Acting Deputy Assistant General Counsel, were on the brief, all of Washington, D.C., for the appellee.

Before KASOLD, PIETSCH, and GREENBERG, *Judges.*

KASOLD, *Judge*, filed the opinion of the Court.  GREENBERG, *Judge*, filed a dissenting opinion.

KASOLD, *Judge*: Veteran Paul L. Ollis appeals through counsel[1] that part of an April 1, 2014, Board of Veterans' Appeals (Board) decision that denied his claim for benefits under 38 U.S.C. § 1151 for a cardiac disability and phrenic nerve paralysis.  Mr. Ollis argues that the Board erred in finding that a VA doctor's advice and recommendations regarding a medical procedure, which ultimately was performed in August 2007 by a non-VA employee in a non-VA facility, fell outside the scope of section 1151.  A panel decision is warranted to address this issue of first impression. *See Frankel v. Derwinski*, 1 Vet.App. 23, 25-26 (1990).  For the reasons stated below, that part of the decision on appeal will be affirmed.

## I.  BACKGROUND

---

[1]  Mr. Ollis filed his Notice of Appeal and initial brief pro se but obtained counsel prior to supplemental briefing.

Mr. Ollis served on active duty from June 1975 to March 1976. In 1997, he was diagnosed with atrial fibrillation.[2] In order to resolve daily episodes of dizziness, light-headedness, and faintness, he underwent an ablation procedure[3] in March 1999 at the Nashville VA medical center (VAMC) and received a pacemaker in July 1999. Throughout the next decade, however, the episodes continued. During this time, Mr. Ollis received medical treatment from the Nashville VAMC, and also from his private cardiologist, Dr. Stephen Teague of Parkway Cardiology, who began seeing Mr. Ollis as early as September 2000.

In June 2007, Mr. Ollis visited the Nashville VAMC for a pacemaker interrogation.[4] As recorded in the medical progress notes, Mr. Ollis informed a VA nurse practitioner that he had experienced another episode in January 2007 and had follow-up with Parkway Cardiology.[5] Mr. Ollis expressed a desire not to go through the ablation procedure again and inquired about MAZE[6] treatment for his atrial fibrillation. The VA nurse practitioner explained that such a procedure was not performed at the Nashville VAMC, but she noted that she would ask Dr. Jeffrey Rottman, also of the Nashville VAMC, to review Mr. Ollis's record and make further recommendations. Seven days later, Dr. Rottman reviewed Mr. Ollis's record and stated in the medical progress notes that, "[s]ur[gi]cal MAZE is one avail[a]ble option. The epicardial MAZE would be the current preference. While this is not available at the VA (specialized operators and equipment are required), it could be performed at other local institutions. Recommendations provided." Record (R.) at 1318.

---

[2] "Atrial fibrillation" is "an arrhythmia in which minute areas of the atrial myocardium are in various uncoordinated stages of depolarization and repolarization due to multiple reentry circuits within the atrial myocardium . . . causing a totally irregular, often rapid ventricular rate." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 701 (32d ed. 2012) [hereinafter DORLAND'S].

[3] This procedure delivers electrical energy through a catheter to cut away at the heart tissue causing the atrial fibrillation. *See* DORLAND'S at 3-4.

[4] A "pacemaker interrogation" measures the functioning and battery status of a pacemaker. *See* Record (R.) at 1316-17.

[5] The record reflects that this follow-up was with Dr. Teague. *See* R. at 403, 404.

[6] "Maze" procedure is the "surgical division of the normal conduction pathways between the sinoatrial node and the atrioventricular node by a series of incisions in the left atrium to create a maze of conduction pathways; its purpose is to allow a normal impulse to activate the atrium while eliminating macroreentrant circuits; done for the relief of atrial fibrillation." DORLAND'S at 1517.

In July 2007, Mr. Ollis visited Dr. Teague to discuss the surgical and medical approaches to atrial fibrillation. Dr. Teague's progress note does not mention any VA recommendation or referral. Rather, the progress note reflects that the discussion "comes on the heels of a recent pacemaker interrogation," that Mr. Ollis wanted to talk directly to Dr. William Hall of Methodist Medical Center (MC) regarding the surgical approach, and that "[Mr. Ollis] will be referred." R. at 405. Dr. Teague also suggested that Mr. Ollis "may wish to discuss the situation with Dr. Ro[tt]man." *Id*. There is no indication from the record that Mr. Ollis followed up on this suggestion prior to the August 2007 surgery.

Three weeks after Mr. Ollis visited Dr. Teague, another private physician, Dr. Hall, evaluated Mr. Ollis for the surgical MAZE procedure. In his progress note, Dr. Hall thanked Dr. Teague for "asking us to see this patient." R. at 87. The progress note does not mention a VA recommendation or referral. Subsequently, in August 2007, Dr. Hall performed the surgery at Methodist MC, which was paid for by Mr. Ollis and his private insurance company. *See* R. at 480. For purposes of this opinion, it is assumed that Mr. Ollis's right phrenic nerve was damaged during the procedure and that his cardiac issues resumed following the surgery.

In July 2008, Mr. Ollis filed for VA benefits for his disabilities related to the August 2007 MAZE procedure. He stated that the procedure was performed at Methodist MC, "where the VAMC Nashville, Heart Department, referred me." R. at 1395. Throughout his administrative appeal, Mr. Ollis argued that VA should be held liable for the treatment he received as a result of VA's referral or recommendation. *See, e.g.*, R. at 862 (Mr. Ollis stating in 2009 Notice of Disagreement that his condition was "the result of treatment received from VA refer[r]ed care"), 851 (Mr. Ollis stating in 2009 letter to VA Nashville regional office that VA should be held "responsible for my condition based on [a] referral" from Dr. Rottman to Parkway Cardiology), 496 (Mr. Ollis stating in 2011 Substantive Appeal that "VA should be held liable for the treatment that caused the injury"), 484 (Mr. Ollis stating "Yes" in his 2011 Board hearing in response to hearing officer's question: "Your argument is that while it wasn't done at a V.A. facility, it was done upon the recommendation of V.A., correct?").

The Board decision on appeal addressed Mr. Ollis's argument and rejected it. The Board found that VA's Dr. Rottman had recommended the MAZE procedure as one option to treat atrial

fibrillation but that the procedure was ultimately performed at a non-VA facility by a non-VA employee. The Board found "no evidence that VA required the private provider to act on it[s] behalf," or that VA supervised or had a contract with Dr. Hall. R. at 19. The Board concluded that the facts of Mr. Ollis's case fell outside the scope of section 1151.

## II. THE PARTIES' ARGUMENTS

In his initial pro se brief, Mr. Ollis (1) notes that VA's Dr. Rottman provided "recommendations of facilities to perform this [MAZE] procedure," and that Mr. Ollis himself "chose a facility that was close to home and family," (2) contends that he "was never instructed at any time by VA about the consequences of having this [procedure] performed without a referral from them," and (3) asks the Court "to consider the recommendations as a verbal referral." Appellant's (App.) Brief (Br.) at 3-4.

Upon obtaining counsel, Mr. Ollis argues that (1) the medical advice and recommendations of VA's Dr. Rottman constituted VA medical treatment that was causally connected to his claimed disabilities, and (2) the record was not fully developed on several issues of proximate cause; i.e., whether VA personnel advised Mr. Ollis of the risks of the procedure or whether the disabilities were not reasonably foreseeable, and whether VA personnel failed to investigate the credentials and capabilities of the recommended doctors such that the recommendation or referral was negligent. Mr. Ollis additionally argues that, when a VAMC cannot perform a procedure, VA has a statutory and constitutional duty to inform a veteran that procedures performed at a non-VA facility might affect section 1151 eligibility. *See* App. Supplemental (Supp.) Br. at 11-17 (citing, inter alia, 38 U.S.C. § 6303(c) and *Cushman v. Shinseki*, 576 F.3d 1290 (Fed. Cir. 2009)).[7]

The Secretary argues that section 1151 is limited by its plain language to medical procedures performed "by a Department employee or in a Department facility," 38 U.S.C. § 1151(a)(1), and that the MAZE procedure here was performed by a private doctor, Dr. Hall, in a private facility. Alternatively, the Secretary asserts that Mr. Ollis's disability was not caused by any VA treatment;

---

[7] Mr. Ollis also contends in his supplemental brief that section 1151 should not be interpreted in a way that creates a perverse incentive for VA to refer or recommend veterans to non-VA facilities in order to avoid section 1151 awards. Succinctly stated, he fails to demonstrate that the denial of medical services in his case was so motivated, and we find no basis for presuming that VA personnel might be perversely motivated to refer patients for non-VA care to avoid section 1151 awards. Other than this notation, we do not further address Mr. Ollis's unfounded suggestion.

4

rather, Mr. Ollis visited another private physician, Dr. Teague, on his own initiative – not based upon a VA referral – and then underwent the surgery by Dr. Hall based on Dr. Teague's referral. The Secretary additionally contends that any medical advice or recommendation by VA's Dr. Rottman was too attenuated to Mr. Ollis's postsurgery disabilities to be considered their cause. Finally, the Secretary contends that there is no statutory or constitutional right to information about section 1151 when a VAMC cannot perform a procedure.

### III. ANALYSIS

#### A. Section 1151 and Causation

"Section 1151 delineates three prerequisites for obtaining disability compensation." *Viegas v. Shinseki*, 705 F.3d 1374, 1377 (Fed. Cir. 2013). First, the claimant must demonstrate a current disability that is not the result of his own willful misconduct. Second, the disability must have been "caused by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility." 38 U.S.C. § 1151(a)(1). Third, the "proximate cause" of the disability must be negligence "or similar instance of fault on the part of [VA]" or "an event not reasonably foreseeable." § 1151(a)(1)(A)-(B).

The Board determined that the facts here did not meet the second requirement (causation) for section 1151 compensation. The Board explained that VA's Dr. Rottman had recommended the MAZE procedure as one available option but that the procedure was ultimately performed – and the disabilities sustained – at a private facility by a private doctor, with no evidence of any contract or relationship between VA and that private doctor. Thus, the Board found that the disabilities were not "caused by a Department employee or in a Department facility." R. at 20.

On appeal, Mr. Ollis disputes this finding. He asserts that the medical advice and recommendations from VA's Dr. Rottman constituted medical treatment that caused Mr. Ollis to visit Dr. Teague, who then referred Mr. Ollis to Dr. Hall, who performed the surgery that resulted in the disabilities. Otherwise stated, Mr. Ollis contends that Dr. Rottman's actions "'gave rise to the risks out of which the injury arose,'" and therefore were a cause of the disabilities. App. Supp. Br. at 6 (quoting VA Gen. Couns. Prec. 7-97, at 7-8 (Jan. 29, 1997) (citing *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504 (1951))).

At the outset, we note that Mr. Ollis's argument that VA's Dr. Rottman "caused" Mr. Ollis

5

**A5**

to seek treatment from Dr. Teague or Dr. Hall, both private physicians, was not raised below by Mr. Ollis or otherwise reasonably raised by the record before the Secretary and the Board, and we find no error in the Board's not addressing this issue. *See Robinson v. Peake*, 21 Vet.App. 545, 552 (2008) (Board must address all issues raised by the claimant or reasonably raised by the record), *aff'd sub nom. Robinson v. Shinseki*, 557 F.3d 1355 (Fed. Cir. 2009). Nevertheless, this argument presents a novel issue and we find the argument well formed and worthy of consideration. *See Maggitt v. West*, 202 F.3d 1370, 1377 (Fed. Cir. 2000) (holding, inter alia, that the Court has discretion to hear legal arguments for the first time on a claim properly before the Court).

To understand section 1151's causation requirement, it is important to review the evolution of the current statutory language, binding caselaw addressing this language, and general views of causation in federal practice. Before 1996, section 1151 required that a current disability be "the result of hospitalization, medical or surgical treatment . . . under any of the laws administered by the Secretary" and "not the result of willful misconduct." In *Brown v. Gardner*, 513 U.S. 115, 119 (1994), the Supreme Court held that such language did not require a showing of fault by the VA; rather, the language "simply [ ] impose[d] the requirement of a causal connection between" the disability and the VA treatment.

In 1996, Congress amended the statute, adding a requirement that the disability be *proximately* caused by VA fault or an event not reasonably foreseeable. The primary purpose of the amendment was to add the element of VA fault to section 1151. *See Bartlett v. Shinseki*, 24 Vet.App. 328, 330 n.2 (2011) (citing, inter alia, 142 CONG. REC. S9932 (daily ed. Sept. 5, 1996)). Congress also replaced the phrase "the result of" with "caused by," but the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has noted that this change "does not appear to have been a substantive change." *Viegas*, 705 F.3d at 1382 n.5.

Addressing the "caused by" language in *Viegas*, the Federal Circuit rejected the Secretary's position that this language requires a disability to be "directly caused by" VA medical treatment, but also rejected a broader view proposed by the appellant. *See id.* at 1378. The Federal Circuit invoked *Gardner*, held that section 1151 requires "only a 'causal connection'" between the disability and VA treatment, *id.* at 1380 (quoting *Gardner*, 513 U.S. at 119), and further held that section 1151 "does not extend to the 'remote consequences'" of VA medical treatment. *Id.* at 1383.

6

**A6**

The notion that section 1151's causation requirement – even before the separate "proximate cause" requirement was added to the statute – does not extend to remote consequences of VA conduct accords with the prevalent practice throughout the federal courts. Although "'[i]n a philosophical sense, the . . . causes of an event go back to the dawn of human events . . . , any attempt to impose responsibility upon such a basis would result in infinite liability,'" and federal statutes with causative language have often been read to exclude remote consequences. *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1546 n.4 (Fed. Cir. 1995) (en banc) (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 41, at 264 (5th ed. 1984)); *see CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2642 (2011) ("To prevent 'infinite liability,' . . . courts and legislatures appropriately place limits on the chain of causation that may support recovery on any particular claim. The term 'proximate cause' itself is hardly essential to the imposition of such limits."); *see also Pac. Operators Offshore, LLP v. Valladolid*, 132 S. Ct. 680, 690-91 (2012) (rejecting interpretation of "as the result of" language in workers' compensation statute that would, "[t]aken to its logical conclusion," encompass workers whose jobs have "virtually nothing to do with" the operations noted in the statute); *Rite-Hite Corp.*, 56 F.3d at 1546 (despite the broad language of 35 U.S.C. § 284, "remote consequences" are not compensable).

Overall, the federal courts have recognized that conduct is not a "cause" of an injury in the legal sense if the injury would have occurred regardless of the conduct, or if there is an intervening exercise of independent judgment, or if the injury is simply too attenuated from the conduct. *See*, *e.g.*, *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983) ("Some effects that are 'caused by' a change in the physical environment in the sense of 'but for' causation, will nonetheless not fall within [the statute's purview] because the causal chain is too attenuated."); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013) ("A defendant's conduct is not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct."); *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (noting, in the context of an unlawful arrest and subsequent conviction and incarceration, that the chain of causation to the arresting officer is severed by an intervening exercise of independent judgment).

Such an attenuation is present here. Based on the record of proceedings (ROP) and facts found by the Board, Mr. Ollis's disability was, at best, a remote consequence of – and not caused by

– VA's conduct.[8]  *See Gardner*, 513 U.S. at 119; *Viegas*, 705 F.3d at 1383.  Although it is unclear what doctors or institutions VA's Dr. Rottman recommended to Mr. Ollis, Dr. Rottman's contemporaneous medical note highlights the MAZE procedure as one option and references providing multiple recommendations.  *See* R. at 1318.  The record further reflects that, about a week after his meeting with Dr. Rottman, Mr. Ollis visited his longtime private physician Dr. Teague, who referred him to Dr. Hall, another private physician, without any indication that VA was involved.  *See* R. at 405 (Dr. Teague's July 2007 progress note stating that Mr. Ollis "will be referred" to Dr. Hall), 87 (Dr. Hall's July 2007 progress note specifically thanking Dr. Teague for "ask[ing] us to see this patient").  Dr. Hall, a non-VA employee, performed the disabling surgery in a non-VA facility, and the Board found no contractual or agency relationship between VA and Dr. Hall.  *See* R. at 19. Based on the ROP, the Board's finding is plausible and not clearly erroneous.  *See Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) ("'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948))); *see also U.S. Gypsum Co.*, 333 U.S. at 396 (assigning little probative weight to testimony that conflicted with contemporaneous documents).

Assuming arguendo that Dr. Rottman's advice and recommendations constitute "medical . . . treatment . . . by a Department employee" (38 U.S.C. § 1151(a)(1)), this "treatment" did not *cause* Mr. Ollis to have the surgery with Dr. Hall.  Even assuming that Dr. Teague and Dr. Hall were two of the private doctors recommended by VA's Dr. Rottman, the fact remains that Dr. Teague specifically referred Mr. Ollis to Dr. Hall, and Mr. Ollis chose to have the MAZE procedure performed by Dr. Hall.  Based on these intervening and independent actions by non-VA actors, the conduct of VA's Dr. Rottman suggesting some physicians to Mr. Ollis that could perform the MAZE procedure, or even referring him to several physicians, is simply too remote from Mr. Ollis's disability to be considered its cause.  *See Gardner*, 513 U.S. at 119; *Viegas*, 705 F.3d at 1383.

---

[8]  Our dissenting colleague notes our holding that Mr. Ollis's disability was not caused by VA conduct because it was, at best, a remote consequence of VA medical treatment, but he fails to note that the Federal Circuit's *Viegas* decision addresses causation and constitutes a binding precedent that is consistent with the general interpretation of "proximate cause" in the federal courts, as discussed in the text prior to this note.

8

**A8**

## B. Negligent Referral

With regard to whether the record was properly developed on the issue of negligent referral, we note that there is no indication from the record that Mr. Ollis raised this issue below. Rather, Mr. Ollis contended during the administrative processing of his claim that VA should be held liable for the consequences of its referral, and the Board addressed this argument. Because the negligent-referral issue was not reasonably raised below, we find no error in the fact that it was not addressed or developed by the Board. *See Robinson*, *supra*. Additionally, Mr. Ollis fails to identify any evidence indicating that Dr. Hall was not qualified to perform the MAZE procedure or that VA medical personnel were negligent in any recommendation regarding who might be able to perform the MAZE procedure. His arguments regarding negligent referral are, therefore, speculative at best, and we decline to address such assertions further. *See Brewer v. West*, 11 Vet.App. 228, 236-37 (1998) (where appellant offers "mere assertions" without providing legal support, the Court need not further discuss the argument); *see also Maggitt*, *supra*.

## C. Duty To Inform Claimants About Section 1151

Mr. Ollis additionally asserts that he was never informed that undergoing the MAZE procedure at a non-VA facility might affect his eligibility for section 1151 benefits, and he argues that VA has a statutory and constitutional duty to provide such information when a VAMC cannot perform a procedure. In support of this argument, Mr. Ollis (1) cites 38 U.S.C. § 6303(c), which states that the Secretary "shall distribute full information to eligible veterans and eligible dependents regarding all benefits and services to which they may be entitled under laws administered by the Secretary," and (2) states that it is "surely inappropriate" that hundreds of thousands of veterans are being referred from VAMCs to private facilities each month, without information as to how that might affect their eligibility for section 1151 benefits. Mr. Ollis also cites *Cushman* for the propositions that (1) he has a constitutionally protected property interest in his application for benefits, 576 F.3d at 1298, and (2) his property interest may not be deprived without notice and a fair opportunity to be heard, *id.* at 1296.

Initially, the Court notes that these arguments were not raised by Mr. Ollis to the Board, or reasonably raised by the record, and we find no error in the Board not addressing them. *See Robinson*, *supra*. Nevertheless, we find them well formed and worthy of consideration in the

9

first instance. *See Maggitt*, *supra*. As to Mr. Ollis's statutory argument, the language of section 6303(c) was located at 38 U.S.C. § 7722(c) prior to 2006 and was reviewed by the Federal Circuit in 2003. The language was found to be hortatory, rather than an enforceable legal obligation. *See Andrews v. Principi*, 351 F.3d 1134, 1137 (Fed. Cir. 2003); *Rodriguez v. West*, 189 F.3d 1351, 1355 (Fed. Cir. 1999) (discussed in *Andrews*). As to Mr. Ollis's argument that the current referral procedures are "surely inappropriate," that argument is a red herring. Regardless of whether it is "inappropriate," Mr. Ollis fails to demonstrate that such notice is legally required. *See Hilkert v. West*, 12 Vet.App. 145, 151 (1999) (en banc) (appellant bears burden of demonstrating error on appeal), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

Our dissenting colleague cites an American Medical Association (AMA) opinion in support of his view that patients of VA medical care should not be "induced" to waive their eligibility for section 1151 benefits without informed consent. *Post* at 13. With great respect for our colleague, the facts of this case do not support the underlying suggestion that Mr. Ollis was "induced" to waive any benefits under section 1151. Moreover, the AMA opinion amounts to a suggestion to inform a patient if treatment by a referred medical specialist or facility is not covered by the patient's insurance; the opinion says nothing about notifying a patient that the referring doctor would not be liable for negligent medical care provided by the referred medical specialist or facility. This case does not involve a request for reimbursement of medical expenses and thus we find the AMA opinion inapposite here.

In support of his constitutional argument that claimants possess a due process right to be notified before losing eligibility for benefits, Mr. Ollis cites *United States v. Copeland*, 376 F.3d 61, 70-73 (2d Cir. 2004), and *United States v. Lopez-Velasquez*, 629 F.3d 894, 897 n.2 (9th Cir. 2010). *Copeland* held that an immigration judge's failure to inform an alien of eligibility for relief from deportation may be fundamentally unfair, but the *Copeland* court based its analysis on an immigration statute, 8 U.S.C. § 1326(d)(3), not on due process. And, although *Lopez-Velasquez* used the term "due process," the "failure to inform" in that case was a failure that occurred during administrative deportation proceedings – not, as here, before administrative proceedings commenced. We therefore find these cases inapposite.

With regard to *Cushman*, the Federal Circuit held in that case that a veteran has a protected

10

property interest in a given disability benefit "upon a showing that he meets the eligibility requirements set forth in the governing statutes and regulations." 576 F.3d at 1298. If a veteran *does not meet* the eligibility requirements for that benefit, however, he does not have a protected property interest in it. *See id.* at 1297 (noting "an absolute right of benefits to *qualified* individuals" (emphasis added)); *see also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) ("To have a property interest in a benefit, a person [ ] must . . . have a legitimate claim of entitlement to it."). This principle recently was made clear by the Federal Circuit in *Devlin v. Office of Pers. Mgmt.*, 767 F.3d 1285, 1288 (Fed. Cir. 2014), where the appellant (representing his mother's estate) argued that his mother had a protected property interest in certain death benefits. The Federal Circuit rejected his argument because (1) filing an application for the benefits was a statutory prerequisite for entitlement to those benefits, and (2) his mother never filed an application that would have established her eligibility. Citing *Cushman* in support, the Federal Circuit held that, "[b]ecause she did not file the necessary application," the appellant's mother "was not entitled to [the death benefits] and thus had no protected property interest in those benefits." *Devlin*, 767 F.3d at 1288. Here, at the time Mr. Ollis was told that VA could not perform his surgery, he had not shown his eligibility for section 1151 benefits. He had not undergone the MAZE procedure, suffered an additional disability, or filed an application for section 1151 benefits. *See Cushman*, 576 F.3d at 1297 ("[*A*]*pplicants* for . . . benefits possess a constitutionally protected property interest in those benefits." (emphasis added)). Succinctly stated, Mr. Ollis's property interest would not vest until and unless he met the eligibility requirements for section 1151 benefits. Therefore, the lack of notice to Mr. Ollis that undergoing the MAZE procedure at a non-VA facility might affect his section 1151 eligibility if his third-party medical care was negligently provided did not constitute a constitutional due process violation, and we find no basis for inserting such a notice requirement within the section 1151 statutory scheme for VA benefits caused by hospital care, medical or surgical treatment.

### D. Remaining Arguments

Because Mr. Ollis does not demonstrate that he meets the second requirement for section 1151 compensation, his argument related to section 1151's third requirement – whether VA medical personnel advised him of the risks of the procedure or whether the disabilities were not reasonably foreseeable – need not be addressed. *See Viegas*, 705 F.3d at 1377 (noting three prerequisites for

11

benefits under section 1151).  In sum, Mr. Ollis fails to demonstrate that VA personnel or treatment caused the disability for which he seeks VA benefits, and he otherwise fails to demonstrate that the Board erred in denying entitlement to benefits under section 1151.  *See Hilkert*, *supra*.

## IV. CONCLUSION

Upon consideration of the foregoing, that part of the April 1, 2014, Board decision on appeal is AFFIRMED.

GREENBERG, *Judge*, *dissenting*: I dissent.  The majority's application of 38 U.S.C. § 1151 is unduly narrow and withdraws necessary protections from a rapidly growing class of veterans.

The Board determined that the appellant was not eligible for benefits based on his phrenic nerve paralysis because that disability was not "caused by hospital care, medical or surgical treatment, or examination furnished the veteran under any law administered by the Secretary, either by a Department employee or in a Department facility as defined in section 1701(3)(A) of this title." 38 U.S.C. § 1151(a)(1).  The majority holds that the Board did not err in its reasoning, because "section 1151 does not extend to the 'remote consequences' of VA medical treatment."[9]

When a veteran's doctor recommends a course of treatment, it is not a remote consequence of that recommendation for the veteran to pursue it.  The appellant's uncontroverted testimony at his Board hearing is dispositive: when he went to the VA medical center with questions regarding the MAZE procedure, his treating physician, Dr. Rottman,[10] specifically "*recommended* that I have the

---

[9] The majority accurately describes the Supreme Court's holding in *Brown v. Gardner*, 513 U.S. 115 (1994), that at the time of the decision, 38 U.S.C. § 1151 lacked a requirement that additional disability be the result of VA carelessness, negligence, lack of proper skill, error in judgment, or similar instance of indicated fault.  The majority also correctly states that Congress amended section 1151 in 1996 and added the requirement that disability be proximately caused by VA fault or an event not reasonably foreseeable.  That fault requirement is not before the Court; the appellant's eligibility for benefits, governed by the first clause of § 1151(a)(1), is in question, but his entitlement to those benefits, governed by the remainder of § 1151(a), including subsections (A), (B), and (2), has not yet been considered by the Court or even the Board.

[10] In an August 10, 2013, letter to VA, the appellant states:

Records show that in 1998, Dr. Crocker, (Knoxville VA outpatient facility) referred me to Nashville VA Cardiology, stating that the Nashville VA has some of the best cardiologist[s] in the nation and that I should have them check me out.  I agreed to the referral and have been under the care of these cardiologists ever since.  I started seeing Dr. Rottman in 1998 for my atrial fib[rillation].  In 1999 an

12

procedure because of my age. [Dr. Rottman] thought I could handle it a lot better than somebody at the age of seventy." R. at 479 (emphasis added). The doctor did not, as the majority suggests, merely perform the administrative task of notifying the appellant of local medical institutions, without endorsing any procedure or medical provider. The record indicates the appellant went to his doctor for *medical advice*, the doctor *recommended* that the appellant undergo the MAZE procedure, and the appellant *consequently* had it performed, resulting in his phrenic nerve injury. The connection between the doctor's recommendation and the performance of the procedure here is hardly attenuated.

I am further concerned that the majority endorses absolving VA and its physicians of any duty to warn claimants when a medical recommendation jeopardizes eligibility for section 1151 benefits. Irrespective of due process, it is inequitable for the appellant to be induced, through a VA doctor's medical recommendation, to waive his eligibility for section 1151 benefits without informed consent as to that waiver. The Court should take heed of the American Medical Association's recognition that "[i]f a physician knows that a patient's health care plan or other agreement does not cover referral to a non-contracting medical specialist or to a facility that the physician believes to be in the patient's best interest, the physician should so inform the patient to permit the patient to decide whether to accept the outside referral." *Code of Medical Ethics* Opinion 8.132 (Am. Med. Ass'n 2007). VA's provision of medical care helps fulfill a promise to our nation's veterans, but it must be implied in that promise that VA will not accept, much less impel, unknowing waiver. This promise is similar to those implied in all contracts. *See, e.g., Wood v. Duff-Gordon*, 222 N.Y. 88, 91, 118 N.E. 214 (1917) (Cardozo, J.) ("The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal."). As a matter of equity, the Court should at least hold that a veteran cannot lose section 1151 eligibility when he or she has followed a VA medical recommendation and was never properly informed of the possible

---

attempt was made to do an ablation at the VA in Nashville. This procedure was unsuccessful at which time a month later, a pacemaker was installed to help with my problem. Records show in 2005 that the pacemaker was defective and the generator was replaced. Then in 2007 this new procedure (Mini Maze) was available and it was then discussed with me to attempt this procedure to correct the atrial fib.

R. at 96. It does not appear from the record that, in his 9 years of treating the appellant prior to 2007, Dr. Rottman had ever recommended a procedure that required the appellant to seek care at a non-VA institution.

13

consequences.

 Permitting such a remedy for veterans is necessary in light of recent developments expanding the provision of care to veterans by non-VA facilities.  *See*, *e.g.*, Pub. L. No. 113-146, § 101(a)(1)(A), (B) (2014) ("The Veterans Access, Choice, and Accountability Act of 2014").  The Court should not reduce the reach of the protective benefits of section 1151 just as Congress increases the number of veterans who will need them.  I cannot join a holding that frustrates the veteran-friendly intent of Congress.  *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 n.*, 1 L. Ed. 436 (1792) ("[T]he objects of this act are exceedingly benevolent, and do real honor to the humanity and justice of Congress.").

14

**A14**

## CERTIFICATE OF SERVICE

On March 14, 2016, the undersigned caused the foregoing document to be filed electronically by using the Court's CM/ECF system.    All parties are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.


*/s/ Paul M. Schoenhard*
Paul M. Schoenhard
Counsel for Claimant-Appellant

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 9,134 words, excluding the parts of the brief excepted by Federal Rule of Appellate procedure 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ *Paul M. Schoenhard*
Paul M. Schoenhard
Counsel for Claimant-Appellant